UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Roseanne Cauley Simons,

        Plaintiff,

v.

Midwest Telephone Sales and
Service, Inc., and Frank Bagot, Sr.,

        Defendants.

MEMORANDUM OPINION
AND ORDER
Civil No. 05-1120 ADM/JSM

---

Andrew T. Jackola, Esq., Mansfield, Tanick & Cohen, P.A., Minneapolis, MN, on behalf of Plaintiff.

Mark C. Hart, Esq., Courey, Kosanda & Zimmer, P.A., Golden Valley, MN, on behalf of Defendants.

---

## I. INTRODUCTION

On May 2, 2006, oral argument before the undersigned United States District Judge was heard on Plaintiff Roseanne Cauley Simons' ("Plaintiff" or "Simons") Amended Motion for Summary Judgment [Docket No. 72] and Defendants Midwest Telephone Sales and Service, Inc. ("Central Telephone")[1] and Frank Bagot, Sr.'s ("Bagot") (collectively, "Defendants") Motion for Partial Summary Judgment [Docket No. 40]. In her Amended Complaint [Docket No. 21], Plaintiff asserts claims for (1) benefits due under an employee benefit plan, pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), (2) unpaid vacation days pursuant to Minn. Stat. § 181.13, and (3) violation of ERISA § 510, 29 U.S.C. §

---

[1] In its Answer [Docket No. 2], the company Defendant states that "Midwestern Telephone Sales and Service, Co. is an inactive Minnesota corporation that was located in Plymouth and was the predecessor of Central Telephone Sales and Service, Inc." For ease of reference, the company Defendant will be referred to as Central Telephone.

1140, based on Defendants' alleged retaliatory firing of Plaintiff for exercising a protected right. For the reasons stated herein, Plaintiff's Motion is granted in part and denied in part, and Defendants' Motion is granted in part and denied in part.

## II. BACKGROUND

Central Telephone is a small company with ten to fifteen employees that sells and services business telephone systems. Hart Aff. [Docket No. 44] Ex. C (Bagot Dep.) at 9. Bagot is the President of Central Telephone. Id. Simons was employed by Central Telephone from February 2000 to May 6, 2004, first as an executive assistant and later as a customer service representative. Simons Aff. [Docket No. 50] at 1. Effective April 1, 1999, Central Telephone instituted a SIMPLE IRA[2] Plan ("Plan") for its employees. Bagot Aff. [Docket No. 43] Ex. B. Employees of Central Telephone are permitted to contribute a portion of their salary to their Plan account each year and Central Telephone is obligated to match the amount contributed by a certain percentage of the employees' salary, not to exceed 3%. Id.

During her employment with Central Telephone, Simons' contributions to her Plan account were: $782 in 2001, $609 in 2002, and $1,000 in 2004. Simons Aff. at 2. During the years she contributed to her Plan account, Simons' salary was: $34,064.64 in 2001, $32,677.08 in 2002, and $11,592.84 in 2004. Hart Aff. Ex. D at 6. Central Telephone decided to make matching contributions up to 3% of its employees' salaries in 2001 and 2004, and up to 1% of its employees' salaries in 2002. Bagot Aff. Ex. B. However, Central Telephone never made any matching contributions to any of its employees' Plan accounts. Bagot Dep. at 26. On April 19,

---

[2] SIMPLE is an acronym for Savings Incentive Match Plan for Employees of Small Employers. Id. IRA stands for Individual Retirement Account or Individual Retirement Annuity.

2004, Simons met with a financial planner who told her that Central Telephone was legally required to make matching contributions to her Plan account. Simons Aff. at 3.

On April 27, 2004, Simons requested vacation days for July 29-30 and August 2-6 for her wedding and honeymoon. Simons Aff. Ex. F. On April 28, 2004, her request was granted. Id. Central Telephone's vacation policy states:

> It is the policy of [Central Telephone] to provide paid time off for full-time salaried employees . . . for Vacations according to the schedule as contained herein, on a calendar year basis, under the following terms and conditions:
>
> 1. Payment is based on present and continued employment. (You must be employed at least one (1) week after your Vacation).
>
> ***
>
> Vacations are earned, when applicable, at the rate of 25% per employed quarter of the calendar year.
>
> EG: 10 days
>
> March 31st    2 & ½ days
> June 30th     2 & ½ days
> Sept. 30th    2 & ½ days
> Dec. 31st     2 & ½ days
>
> Any exceptions to the above terms and conditions must have the approval of Management. Where possible exceptions will be considered.
>
> Unused Vacation days are forfeited and are not carried over to the next calendar year.

Bagot Aff. Ex. A. As an employee in her fifth year of employment, Simons was entitled to a maximum of ten vacation days under the vacation policy for the year 2004. Id. Simons took vacation days on January 2, March 29, and April 23, 2004. Hart 2d Aff. [Docket No. 66] Ex. E.

On May 6, 2004, Bagot fired Simons. The exact words and actions that took place

between Bagot and Simons immediately proceeding Simons' firing are disputed by the parties.[3] Simons delivered a letter to Bagot at his office on the morning of May 6, claiming that no matching contributions had been made to her Plan account and inquiring as to when those contributions would be made. Simons Aff. Ex. D. That afternoon, Bagot approached Simons with her letter in his hand, asking her what the letter was about. Simons Aff. at 4; Hart Aff. Ex. B (Simons Dep.) at 44-45; Bagot Dep. at 34. Simons asked again when matching contributions would be made and Bagot responded that no matching contributions would be made due to Central Telephone's financial difficulties. Simons Aff. at 4; Simons Dep. at 45-47; Bagot Dep. at 25-27, 33-34. According to Simons, Bagot next asked, "Since when do we leave letters here for me?" Simons Aff. at 4; Bagot Dep. at 34, 50. Simons allegedly stated that she wanted everything between herself and Bagot to be in writing because she could no longer trust him. Bagot Dep. at 29, 33-34, 37, 51; Simons Aff. at 4.[4] Bagot allegedly said "you are unhappy with me and now you've made me unhappy, and I think you should leave." Simons Aff. at 5; Simons Dep. at 49-50; Bagot Dep. at 29, 33-34. Simons asked Bagot if he was firing her and Bagot responded affirmatively.[5] Simons Aff. at 5; Simons Dep. at 50; see Bagot Dep. at 37, 44.

---

[3] At oral argument, Plaintiff's counsel stated that Plaintiff concedes to Defendants' version of the facts.

[4] On April 27, 2006, Simons filed a declaration, stating that there had been a drafting error in her previously filed affidavit. Simons stated in her declaration that she told Bagot she did not trust him after he fired her, not before, in response to his offer to provide references for her when she looked for a new job. Simons Decl. [Docket No. 76]. Simons also testified to this order of events in her deposition. Simons. Dep. at 45-51.

[5] Defendants allege that they had "an ongoing consensus that we should let Rose go," due to Central Telephone's financial difficulties and because she was the "most unproductive" employee, but decided to hold off on her termination after hearing rumors that she planned to voluntarily quit after she got married in the summer of 2004. Bagot Dep. at 44-47.

## III. DISCUSSION

**A.     Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     Claim for Benefits Due**

Plaintiff claims, pursuant to ERISA 29 U.S.C. § 1132(a)(1)(B), that she is owed $1,456.55 in unpaid employer matching contributions to her Plan account. Defendants concede that they owe $1,456.55 to Plaintiff under the terms of the Plan. Consequently, summary judgment is granted in favor of Plaintiff on her claim for benefits due in the amount of $1,456.55.

**C.     Claim for Unpaid Vacation Days**

Simons and Defendants both move for summary judgment on Simons' claim for unpaid vacation days. Both arguments essentially rest on their interpretation of when employee

vacation days are "earned" under the vacation policy.  Simons argues that vacation days are earned at the beginning of each quarter.  Simons was employed in the second quarter of 2004, and therefore, under her interpretation of the vacation policy, she had earned five vacation days.  Simons had only taken three vacation days before her termination, and as a result, she claims she is entitled to compensation for two vacation days.[6]  Defendants argue that, pursuant to the vacation policy, vacation days are earned at the end of each quarter.  Simons earned 2.5 vacation days for her employment through the end of the first quarter of 2004, but took three vacation days before her termination.  As a result, Defendants aver Simons has no unpaid earned vacation days.

"An employer's liability for employees' vacation pay is wholly contractual."  Brown v. Tonka Corp., 519 N.W.2d 474, 477 (Minn. Ct. App. 1994).  In this case, Simons was bound by a vacation policy which states "[p]ayment is based on present and continued employment.  (You must be employed at least one (1) week after your Vacation)."  Bagot Aff. Ex. A.  The plain language of the contract supports the argument that Simons is not entitled to compensation for any vacation days not taken before her termination because she would not be employed by Central Telephone after those dates.  In addition, the vacation policy states that "[v]acations are earned, when applicable, at the rate of 25% per employed quarter of the calendar year," and provides an example which demonstrates that vacation days are earned at the end of each quarter.  Id.  The example shows that Simons had earned only 2.5 vacation days at the time of

---

[6] In her Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment [Docket No. 49], Simons argues that she is entitled to compensation for "presumably accrued" vacation time that was approved for July 29-30 and August 2-6, 2004.  At oral argument, Simons abandoned this argument and conceded that at most, she is entitled to compensation for two vacation days.

her termination. Simons had already taken three vacation days in 2004, and as a result, Simons has no unpaid earned vacation days. See Hart 2d Aff. Ex. E.

Simons argues that if vacation days are not earned until the end of the quarter, it would not be possible for employees to ever take vacation days earned at the end of the fourth quarter since the vacation policy also states that "[u]nused vacation days . . . are not carried over to the next calendar year." Bagot Aff. Ex. A. However, just because vacation days are not "earned" prior to the end of the quarter does not mean that Central Telephone does not approve vacation days that have not yet been earned but presumably will be. The vacation policy also states that "[w]here possible exceptions [to the vacation policy] will be considered." Id. In fact, Defendants demonstrated their willingness to grant unearned vacation days by granting Simons' request for a third vacation day in 2004 even though she had only earned 2.5 vacation days at the time of the request. As a result, with respect to Plaintiff's claim for unpaid vacation days, Plaintiff's Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted.

**D.     ERISA Retaliation Claim**

Simons moves for summary judgment on her ERISA § 510 retaliation claim. ERISA § 510 states in relevant part: "It shall be unlawful for any person to discharge . . . a participant or beneficiary for exercising any right to which [s]he is entitled under the provisions of an employee benefit plan . . . ." 29 U.S.C. § 1140. Simons argues that under either (1) the three-step burden-shifting paradigm established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) or (2) the mixed-motives analysis articulated in Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989), she is entitled to summary judgment. However, under either standard, a

genuine issue of fact precludes summary judgment. Plaintiff has presented evidence that she was fired immediately after asking her boss why required matching contributions were not made to her Plan account and when such contributions would be made. Plaintiff argues that her evidence demonstrates that she was fired solely for exercising a right protected by ERISA.[7] Defendants, however, have presented evidence that Plaintiff was fired for insulting her boss. When Bagot asked Simons why she wrote a letter to him instead of discussing face-to-face with him her concerns about the matching contributions, Simons allegedly told Bagot that she needed everything between them in writing because she no longer trusted him. Bagot alleges that Simons' "insult," along with the pre-existing consensus that Simons should be fired due to Central Telephone's financial difficulties and Simons' unproductiveness, are the reasons that Simons was terminated. The evidence presented creates a genuine issue for trial and as a result, Plaintiff's Motion for Summary Judgment with respect to her claim for a violation of ERISA § 510, 29 U.S.C. § 1140, is denied.[8]

**E. Bagot's Personal Liability**

---

[7] For purposes of this Motion only, the Court will assume that Simons' complaint about Central Telephone's failure to make matching contributions and inquiry as to when matching contributions would be made was a protected activity under ERISA § 510, but notes that it is an open issue in the Eighth Circuit. See Langlie v. Onan Corp., 192 F.3d 1137, 1141 (8th Cir. 1999).

[8] The parties also make arguments concerning the latter portion of ERISA § 510, which states: "It shall be unlawful for any person to discharge . . . any person because [s]he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter . . . ." Based on the plain language of the statute, this portion of the statute is inapplicable to the instant case. See Nicolaou v. Horizon Media, Inc., 402 F.3d 325, 329-30 (2d Cir. 2005) (holding that § 510 protects a person who provides information in response to an informal request for information but not a person who voluntarily makes written or oral complaints to a supervisor).

Bagot also moves for summary judgment that he can not be held personally liable for Simons' claims against Central Telephone. Plaintiff asserts her only claim against Bagot personally is her ERISA § 510 retaliation claim. Bagot cites Rockney v. Blohorn, 877 F.2d 637, 642-43 (8th Cir. 1989) and Solomon v. Klein, 770 F.2d 352, 354 (3d Cir. 1985), for the proposition that he can not be held personally liable for Simons' ERISA § 510 claim because there is no basis for piercing the corporate veil. Simons argues that Bagot can be held liable because he is the "person responsible for the violation," and that Rockney is inapplicable because it concerns an ERISA § 502 claim, not an ERISA § 510 claim. See Rush v. McDonald's Corp., 760 F. Supp. 1349, 1357 (S.D. Ind. 1991).

Rockney involves a different factual scenario from the instant case as well as a different provision of ERISA. With her ERISA § 510 claim, Simons is not seeking to pierce the corporate veil and hold Bagot personally liable for Central Telephone's ERISA violations; rather, Simons seeks to hold Bagot liable for his alleged direct violation of ERISA § 510 by firing her in response to her complaint regarding matching contributions to her Plan account. The difference is significant because ERISA § 510 is directed at the "person" who fires an employee in retaliation for exercising a right under an employee benefit plan. Under ERISA, a "person" can be an individual. 29 U.S.C. § 1002(9). While Simons was employed by Central Telephone, Bagot is the president of Central Telephone and the person who directly fired Simons. As a result, Simons can properly maintain her ERISA § 510 claim against Bagot and Bagot's Summary Judgment Motion on this issue is denied.

**F.     Anger Management**

In her Complaint, Simons asks for "[a]n Order by the Court requiring Defendant Bagot to

attend anger management classes." Bagot correctly argues that there is no basis in law or fact for granting this request. Simons has cited no precedent for requiring a corporate officer or a plan administrator to take anger management classes as a result of an ERISA violation. Simons has also proffered insufficient facts to show that Bagot has an anger management problem. In her deposition, Simons alleged that Bagot was angry on the day that he fired her, but Simons could not recall any other instance during the four years that she worked for him in which he exhibited angry behavior toward her. Simons Dep. at 28-29. As a result, Simons' request for anger management as an equitable remedy is denied.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Amended Motion for Summary Judgment [Docket No. 72] is **GRANTED IN PART AND DENIED IN PART**; and

2. Defendants' Motion for Partial Summary Judgment [Docket No. 40] is **GRANTED IN PART AND DENIED IN PART**.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: June 1, 2006.